Rowhouses, Inc. v. Myishia Smith, No. 60, September Term, 2015

**NEGLIGENCE – LEAD-BASED PAINT – CIRCUMSTANTIAL EVIDENCE – REASONABLE PROBABLE SOURCE OF LEAD EXPOSURE –** Court of Appeals held that trial court erred in granting summary judgment in defendant's favor as to plaintiff's negligence claim where, even without direct evidence that subject property contained lead-based paint and without expert testimony as to source of plaintiff's lead exposure, there was sufficient admissible circumstantial evidence from which trier of fact could conclude that subject property contained lead-based paint; and, evidence was sufficient for jury to conclude that subject property was reasonable probable source of plaintiff's lead exposure, and that there were no other reasonably probable sources of lead exposure.

Circuit Court for Baltimore City
Case No. 24-C-11-006715

Argued: February 5, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 60

September Term, 2015

_____

ROWHOUSES, INC.

v.

MYISHIA SMITH

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Wilner, Alan M. (Retired,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed:  March 25, 2016

In this case, we are asked yet again to address causation in a lead-based paint case where a plaintiff's case rests on circumstantial—as opposed to direct—evidence, and, in this context, we are called upon to attempt to define what constitutes a reasonable probable source of lead exposure. Specifically, here, we decide whether, in the absence of direct evidence that a property contained lead-based paint, there was sufficient admissible circumstantial evidence produced by a plaintiff, who alleged that she was injured as a child by lead-based paint at a property that the defendant owned and managed, to survive the defendant's motion for summary judgment, such that the trial court erred in granting summary judgment in the defendant's favor as to the plaintiff's negligence claim.

We hold that the trial court erred in granting summary judgment in the defendant's favor as to the plaintiff's negligence claim where, even without direct evidence that the subject property contained lead-based paint and without expert testimony as to the source of the plaintiff's lead exposure, there was sufficient admissible circumstantial evidence from which a trier of fact could conclude that the subject property contained lead-based paint; and, the evidence was sufficient for a jury to conclude that the subject property was a reasonable probable source of the plaintiff's lead exposure, and that there were no other reasonably probable sources of lead exposure.

## BACKGROUND

### The Residential History

Myishia Smith ("Smith"), Respondent, alleges that she suffered lead-based paint poisoning while residing at 1622 East Oliver Street ("the Oliver Street Property") from approximately 1991 to 1993. At various times during the first years of her life, Smith also

resided at 418 South Monroe Street ("the Monroe Street Property") and 1508 North Collington Avenue ("the Collington Avenue Property"), and visited 2017 Ashland Avenue ("the Ashland Avenue Property").

On October 21, 1991, Smith was born. According to Smith's mother, Doris Plater ("Plater"), Smith lived at the Monroe Street Property from her birth until Spring 1992. At her deposition, Plater testified that the Monroe Street Property was in "[g]ood condition."

No later than Spring 1992, Plater and Smith moved from the Monroe Street Property to the Oliver Street Property.[1] At that time, Rowhouses, Inc. ("Rowhouses"), Petitioner, owned and managed the Oliver Street Property. According to Plater, approximately "three to four months" after she and Smith moved into the Oliver Street Property, she noticed that the paint on the "[w]indowsills, the banister[, and the] baseboards" "started chipping and peeling[.]" Plater also noticed dust on the floor. During the time that Plater and Smith lived at the Oliver Street Property, Smith began to walk at age ten months, and Plater testified that Smith spent time in areas in the house near deteriorated paint and that she observed Smith put her hands in her mouth while living in the Oliver Street Property. Indeed, according to Plater, Smith put her hands in mouth "three or four times out of a day." Smith spent most of her time at the Oliver Street Property, and did not attend daycare and was not babysat at any other address while residing at the Oliver Street Property. In

---

[1]At her deposition, Plater testified that she and Smith moved out of the Monroe Street Property and into the Oliver Street Property "sometime in the spring" of 1992. In a later-filed affidavit, however, Plater averred that she and Smith moved out of the Monroe Street Property and into the Oliver Street Property in "approximately 1991[.]"

Spring 1993, Plater and Smith moved from the Oliver Street Property[2] to the Collington Avenue Property, where they resided until Spring 1994.

While Smith resided at the Monroe Street Property, the Oliver Street Property, and the Collington Avenue Property, Plater took Smith to visit her grandmother at the Ashland Avenue Property "[e]very week" for approximately "[t]wo, three hours."[3] Plater never observed any chipping, flaking, or peeling paint at the Ashland Avenue Property.

Smith's blood-lead levels were tested on three occasions between 1992 and 1993—September 25, 1992, May 28, 1993, and September 21, 1993. On September 25, 1992, while Smith was residing at the Oliver Street Property, Smith's blood-lead level was reported as 11 micrograms per deciliter ($\mu$g/dL); on May 28, 1993, Smith's blood-lead level was reported as 7 $\mu$g/dL;[4] and on September 21, 1993, while Smith was residing at the Collington Avenue Property, Smith's blood-lead level was reported as 15 $\mu$g/dL.[5]

---

[2]From April 11, 1991, until December 23, 1996, Rowhouses owned and managed the Oliver Street Property. Thus, Rowhouses owned and managed the Oliver Street Property throughout the time period during which Smith resided there.

[3]At her deposition, Plater testified that, while residing at the Monroe Street Property, she took Smith to the Ashland Avenue Property "[e]very week." By contrast, when asked by Rowhouses's counsel if, while residing at the Oliver Street Property, she took Smith to the Ashland Avenue Property "every **other** week like [she did] when [she was] at" the Monroe Street Property, Plater responded "[y]es." (Emphasis added).

[4]According to Plater, she and Smith moved from the Oliver Street Property to the Collington Avenue Property in Spring 1993; thus, it is not clear whether the May 28, 1993 testing of Smith's blood-lead levels occurred while she was residing at the Oliver Street Property or soon after she moved out of the Oliver Street Property. However, in their briefs, both parties state that the May 28, 1993 testing occurred while Smith was residing at the Oliver Street Property.

[5]Smith also had her blood-lead levels tested in 1994 and 1995, with the following results: on March 23, 1994, Smith's blood-lead level was reported as 8 $\mu$g/dL; on January

**The Litigation**

On October 24, 2011, Smith filed in the Circuit Court for Baltimore City ("the circuit court") a complaint and demand for jury trial against Rowhouses and the Collington Avenue Property's owner for negligence and violations of the Maryland Consumer Protection Act arising out of Smith's alleged exposure to lead-based paint at the Oliver Street Property and the Collington Avenue Property.[6] By the time that Smith filed the complaint, the Oliver Street Property had been demolished and thus could not be tested for lead-based paint. Moreover, before being razed, the Oliver Street Property had not been tested for lead-based paint, and there were no violation notices issued for lead-based paint hazards. In other words, there was no direct evidence that the Oliver Street Property contained lead-based paint.

The parties engaged in discovery and identified expert witnesses. Smith designated Robert K. Simon, Ph.D. ("Dr. Simon"), as an expert in "toxicology, lead risk assessment[,] and industrial hygiene." On October 11, 2013, Dr. Simon prepared a report evaluating whether certain properties "were substantial contributing sources of lead exposure during [Smith's] early childhood." As to the Oliver Street Property, Dr. Simon stated that "deed records showed that the [Oliver Street Property] was built most likely in the early 1900s or before[,]" and that "[t]he age of th[e] house would presume the presence of lead[-]based

_____

17, 1995, Smith's blood-lead level was reported as 11 μg/dL; and in May 1995, Smith's blood-lead level was reported as 8 μg/dL.

[6]On December 8, 2011, Smith voluntarily dismissed with prejudice her claims of negligence and violations of the Maryland Consumer Protection Act against the Collington Avenue Property's owner.

paint[.]" Dr. Simon concluded that "it was more likely than not that [the Oliver Street Property] contained lead[-]based paint hazards during [Smith]'s residency." Dr. Simon noted that the information that had been provided to him indicated the presence of "deteriorated paint" at the Oliver Street Property while Smith resided there. In the report, Dr. Simon opined:

> It is my opinion to a reasonable degree of scientific probability that [S]mith was initially exposed to lead[-]based paint hazards during her residency at [the Oliver Street Property] from some months to about 2 years. She then continued to be exposed to lead[-]based paint hazards when she lived at [the Collington Avenue Property] from age 2 to 3 years. . . . It is my opinion to a reasonable degree of scientific probability that [the Oliver Street Property] and [the Collington Avenue Property] were both substantial, contributing sources for her lead exposure, elevated blood[-]lead levels [] and lead poisoning during [] Smith's early childhood.

(Paragraph break omitted).

On April 30, 2014, in response to supplemental documents that had been provided to him, Dr. Simon sent a letter to Smith's counsel. In the letter, Dr. Simon noted that Plater had provided the following information at her deposition:

> [Plater] reported on deteriorated paint at [the Oliver Street Property] that was similar to the information [that was previously] provided[.]
>
> [Plater] did not report deteriorated paint at other [] childhood residences[ of Smith's].
>
> [Plater] reported that [Smith] visited . . . [the Ashland Avenue Property] for several hours each week during her early childhood. [Plater] reported that this location did not have deteriorated paint.
>
> * * *
>
> [Plater] reported that [Smith] did not visit parks, playgrounds or attend daycare during her early childhood. [Plater] reported that she [] provided child care for [Smith] at their residences.

According to Dr. Simon, review of this supplemental information did not necessitate any change to his October 11, 2013 report, in which he opined that the Oliver Street Property was a substantial contributing source of Smith's lead exposure.

On May 5, 2014, Dr. Simon was deposed. At his deposition, the following exchange occurred as to potential sources of lead exposure during Smith's early childhood:

[ROWHOUSES'S COUNSEL:] As we sit here today[,] do you have an opinion as to whether or not [the Monroe Street Property] was a source of lead ingested by [Smith]?

[DR. SIMON:] Yes.

[ROWHOUSES'S COUNSEL:] And what is your opinion, Doctor?

[DR. SIMON:] Most likely not for two reasons. First of all, I have no blood[-]lead data indicating an exposure at that location. Number two, [Smith] really lived there approximately six months, so [Smith] is out of that location before [she]'s really crawling, walking, moving around to get into any kind of lead risk. By eleven months we're at [the Oliver Street Property]. So again I don't think there's any data that would indicate to me that there was a problem of potential exposure at [the Monroe Street Property]. I can't say absolutely there couldn't have been, but I don't see any information that would indicate that it was likely to have occurred.

[ROWHOUSES'S COUNSEL:] And just for my clarification purposes, you're basing that opinion on because you did not see any blood[-]lead testing data that would indicate [the Monroe Street Property] as a record address as part of your basis. Is that correct?

[DR. SIMON:] That's part of it. And she was born October 21st, 1991. By the spring of 1992 they had moved to [the Oliver Street Property]. She's five or six months old. Normally until the child is crawling around and can get into stuff on their own, they're sitting in various restrainer type of chairs or cribs or whatever, and normally they're not going to be at high risk of being exposed at that young age. So for both of those reasons I would say more likely than not she wasn't exposed at [the Monroe Street Property].

[ROWHOUSES'S COUNSEL:] Doctor, have you been furnished with any

- 6 -

records at all for [the Ashland Avenue Property]?

[DR. SIMON:] [The Ashland Avenue Property]?  No.  Originally I knew nothing about that location until I read [Plater]'s deposition that that was apparently the residence of the maternal grandmother for a number of years and that [Smith] had visited there during her early childhood, but I know nothing about [the Ashland Avenue Property] other than that [Plater] made the comment that there was no deteriorated paint.  Other than that, I have no information about that address.

**[ROWHOUSES'S COUNSEL:] Do you have an opinion as to whether or not [the Ashland Avenue Property] was a source of lead ingested by [Smith]?**

**[DR. SIMON:] No, because I have no data on it.  I couldn't rule it in, and I couldn't rule it out at this point.**

(Emphasis added).

Dr. Simon was also questioned about the significance of the age of a property, and the following colloquy occurred:

[ROWHOUSES'S COUNSEL:] Doctor, you mentioned that you presume that a property contains lead-based paint or contains lead based on its age, particularly if it is built before 1950, correct?

[DR. SIMON:] Correct.

\* \* \*

[ROWHOUSES'S COUNSEL:] If we take away the age of the property in this case, are you able to make a determination or an opinion that there was lead in the property without having any information about the age if we didn't know that?

[DR. SIMON:] I don't know the answer to that question because if you're taking the age away, then what do I know about the property?

[ROWHOUSES'S COUNSEL:] Assuming you have all the other information that you have here today, if you didn't know the age of the property, would you then be able to opine that there was lead or lead-based paint hazards inside [the Oliver Street Property]?

[DR. SIMON:] No. If the house was built in 2014, then I wouldn't assume it had lead-based paint hazards. So again the age of the property has to be one where we're going to have used lead-based paint. In Baltimore we've already said no interior paint after 1966, no exterior paint after the federal banning in 1978. So yeah, if the house was built after 1978, then more likely than not it didn't contain lead-based paint.

On cross-examination by Smith's counsel, when asked whether "age of the property was a consideration but not the only consideration that le[]d [him] to [his] opinions with regard to" the Oliver Street Property, Dr. Simon responded: "Correct. It's one of the considerations or parameters that you review in coming to this type of assessment as to whether there w[ere] lead-based paint hazards."

Dr. Simon opined that the Oliver Street Property was a "substantial contributing source[]" of Smith's lead exposure. Dr. Simon testified that he based this opinion on the age of the Oliver Street Property, Plater's "testimony about deteriorated paint[,]" and Smith's elevated blood-lead levels, age, and "hand to mouth activity" while she was residing at the Oliver Street Property.

Smith designated Vera B. Brown, MD ("Dr. Brown"), a pediatrician, as a medical expert. On November 18, 2013, Dr. Brown prepared a report in which she opined:

> Smith was exposed to flaking and peeling paint at [the Oliver Street Property] and [the Collington Avenue Property]. This exposure took place during the first 2 years of her life when her developing brain would have been most susceptible to the effects of lead. This caused loss of IQ and cognitive deficits as well as neuropsychological abnormalities all attributable to lead exposure and resulting brain damage. Records show consistently elevated (by today's standards) of [blood-]lead [levels] until at least 6 years old. [] Smith was therefore injured as a result of lead exposure. She had numerous absences[,] which are common in lead[-]exposed children. She had difficulty learning and eventually quit school. These injuries are permanent and will likely lead to loss of income and inability to properly care for her child. The

- 8 -

exposure to lead at a critical time in her life is an extremely important cause of these injuries.

On May 29, 2014, Rowhouses filed a motion for summary judgment and memorandum in support, arguing that Dr. Simon lacked an adequate factual basis for his opinion that the Oliver Street Property was a source of Smith's lead exposure, that Dr. Simon should be precluded from offering his opinion, and that Smith had failed to produce other evidence showing that the Oliver Street Property contained lead-based paint. Rowhouses asserted that it was entitled to judgment as a matter of law because, absent "credible evidence that [Smith] ingested any lead from" the Oliver Street Property, Smith could not "meet her burden of proof regarding causation[,]" *i.e.*, to show that the Oliver Street Property was a substantial contributing factor to her injuries.

On June 12, 2014, Smith filed a motion to strike the motion for summary judgment or, in the alternative, an opposition to the motion for summary judgment. Smith contended that the motion for summary judgment was filed almost two months after the dispositive motions deadline established by the circuit court's scheduling order and that the motion should have been stricken for that reason. Alternatively, Smith argued a genuine dispute of material fact precluded the grant of summary judgment. Smith attached to the opposition an affidavit in which Plater averred, in pertinent part:

> [Smith] and I lived at [the Oliver Street Property] from approximately 1991 to approximately 1993.
>
> [Smith] spent almost all of her time at [the Oliver Street Property] when we lived there.
>
> [Smith] occasionally visited her grandmother at [the Ashland Avenue Property] when we lived at [the Oliver Street Property]. When [Smith]

visited [the Ashland Avenue Property], I never saw chipping, peeling or flaking paint at th[e] property.

[Smith] had no contact with old battery casings, lead figures, painted toys, plastic jewelry, naval paint, bullets, fishing weights, ceramic pottery, folk medicine[,] or any other source of lead to my knowledge when she had elevated blood[-]lead levels while we resided at [the Oliver Street Property].

On June 26, 2014—six days after this Court issued Hamilton v. Kirson, 439 Md. 501, 96 A.3d 714 (2014)—Smith filed a supplement to the opposition to which she attached various exhibits, including: (1) printouts from the State Department of Assessments and Taxation for properties near the Oliver Street Property—1623, 1624, 1626, 1628, and 2324 East Oliver Street—showing that the properties were built in either 1914 or 1915; (2) records from the Baltimore City Health Department Lead Paint Poisoning Prevention Program showing that properties on East Oliver Street had been issued numerous lead-based paint violation notices over the years; (3) an "Emergency Violation Notice and Order to Remove Lead Nuisance" issued on August 11, 1987, by the Baltimore City Health Department for 1620 East Oliver Street—the row house immediately next door to the Oliver Street Property—noting the presence of lead-based paint on twenty-six interior surfaces and five exterior surfaces; (4) a second "Emergency Violation Notice and Order to Remove Lead Nuisance" issued on January 6, 1988 for 1620 East Oliver Street noting the presence of lead-based paint on ten interior surfaces; and (5) a "Lead-based Paint Survey Report" prepared by Arc Environmental, Inc. for 2324 East Oliver Street noting the presence of lead-based paint on twelve interior surfaces.

On June 27, 2014, the circuit court conducted a hearing on the motion for summary judgment. At the conclusion of the hearing, the circuit court granted the motion for

summary judgment, orally ruling from the bench as follows:

> I looked closely at [Dr.] Simon['s] reports. . . . [F]or [the Oliver Street Property], Dr. Simon said that the age of this house would presume the presence of lead-based paint according to Maryland regulations. And [Smith's] information and the blood-lead levels would indicate that deteriorated paint at this property during [Smith]'s residency in 1991 to 1993, age a few months to two years, led him to the conclusion that it was more likely than not that this house contained lead-based paint hazards during [her] residency.
>
> I am compelled by [Hamilton, 439 Md. 501, 96 A.3d 714,] to find that that's not enough. . . .
>
> An expert may . . . extrapolate from data and facts contained in others' reports and studies in order to form his [or her] expert opinion. Facts upon which an expert bases his [or her] opinion must . . . permit reasonably accurate conclusions as distinguished from mere conjecture and guess.
>
> . . . I cannot let this case go to a jury based on the presumption that the age of the house provides, [that the Oliver Street Property is] a source of lead exposure in this case. That's all [Smith] ha[s] at the current time in this case. And I'm compelled to grant the motion for summary judgment.

Immediately thereafter, Smith's counsel asked the circuit court whether it was "finding that [the] Ashland Avenue [Property] was a reasonable probable source as well . . . [b]ecause under that scenario, there is no other . . . property but" the Oliver Street Property. In response, the circuit court stated: "I have and I cannot get past the speculative . . . nature . . . as to the address. I simply don't think I have a choice."

On June 30, 2014, the circuit court issued an order that was consistent with its oral ruling, denying the motion to strike the motion for summary judgment and granting summary judgment in favor of Rowhouses as to both negligence and the Maryland

Consumer Protection Act claim.[7]

Smith appealed, and in a reported opinion, the Court of Special Appeals reversed the circuit court's grant of summary judgment as to negligence, affirmed the circuit court's judgment in all other respects, and remanded for further proceedings. See Smith v. Rowhouses, Inc., 223 Md. App. 658, 669, 117 A.3d 622, 628 (2015). The Court of Special Appeals held that there was sufficient admissible circumstantial evidence to show the presence of lead-based paint at the Oliver Street Property while Smith was residing there, explaining:

> The evidence on the summary judgment record, when viewed in the light most favorable to Smith, showed that there was admissible evidence to prove the following facts: (1) from not long after her birth and for the next year, Smith spent the majority of her time at the Oliver Street Property, which contained peeling, chipping, and flaking interior paint; (2) the Monroe Street Property, where Smith lived before moving to the Oliver Street Property, was in "[g]ood condition," meaning that it did not have the peeling, chipping, or flaking interior paint that later was seen at the Oliver Street Property; (3) the Ashland Avenue Property, which Smith visited frequently, did not have peeling, chipping, or flaking interior paint; (4) while living at the Oliver Street Property, Smith often was seen with her hands on interior areas that had peeling, chipping, and flaking paint and then with her hands in her mouth; (5) Smith had her first elevated blood-lead level when she was living at the Oliver Street Property; (6) Smith did not have contact with any other known source of exposure to lead at that time; and (7) the Oliver Street

---

[7]At the hearing on the motion for summary judgment, Smith's counsel stated that he would "not provid[e] an opposition" to Rowhouses's motion for summary judgment as to Smith's claim for violations of the Maryland Consumer Protection Act. And, at oral argument in this Court, Smith's counsel confirmed that, at the hearing on the motion for summary judgment, he "submitted" on the claim for violations of the Maryland Consumer Protection Act. On appeal, Smith did not challenge the circuit court's grant of summary judgment as to the Maryland Consumer Protection Act claim, and the Court of Special Appeals did not address the matter. See Smith v. Rowhouses, Inc., 223 Md. App. 658, 660 n.1, 117 A.3d 622, 623 n.1 (2015). Similarly, we do not address the grant of summary judgment as to the Maryland Consumer Protection Act claim.

Property was built before 1950. . . . [T]his evidence could support a reasonable inference by the trier-of-fact that the Oliver Street Property was the only *reasonably probable* source of the lead to which Smith was exposed before she first tested positive for lead on September 25, 1992. Because there was adequate circumstantial evidence on the summary judgment record to show the presence of lead-based paint in the Oliver Street Property when Smith was living there, summary judgment should not have been granted in favor of [Rowhouses] on the negligence count.

Id. at 668-69, 117 A.3d at 627-28 (emphasis in original) (footnote omitted).[8]

Rowhouses petitioned for a writ of *certiorari*, which this Court granted. See Rowhouses v. Smith, 445 Md. 19, 123 A.3d 1005 (2015).

## DISCUSSION

Rowhouses contends that the circuit court was correct in granting summary judgment in its favor because the circumstantial evidence presented by Smith was insufficient to show both that the Oliver Street Property contained lead-based paint and that Smith ingested lead-based paint at the Oliver Street Property. Stated otherwise, Rowhouses argues that the circumstantial evidence that Smith produced was legally

---

[8]In the Court of Special Appeals, Smith also contended that Dr. Simon had "a substantial factual basis for his opinions and properly considered multiple potential sources of exposure." In response, Rowhouses argued that Dr. Simon "lacked a sufficient factual basis to support his opinion that [the Oliver Street Property] was the source of [Smith]'s lead exposure or the cause of any injuries allegedly therefrom." (Emphasis omitted). The Court of Special Appeals concluded: "Dr. Simon's opinion that there was lead-based paint inside the Oliver Street Property rested solely on an inadequate factual basis[ *i.e.*, the age of the Oliver Street Property]. Therefore it was not admissible, and the circuit court correctly ruled that it could not be used to prove causation." Smith, 223 Md. App. at 666, 117 A.3d at 626. Neither Smith nor Rowhouses filed a petition for a writ of *certiorari* or a cross-petition raising an issue as to whether Dr. Simon had an adequate factual foundation to support his opinion that the Oliver Street Property contained lead-based paint and was a substantial contributing source of Smith's lead exposure. Accordingly, we do not address the matter.

insufficient to prove proximate cause, an element of negligence. According to Rowhouses, where a plaintiff does not present direct evidence of lead-based paint at a subject property and instead relies on circumstantial evidence, that circumstantial evidence "must be sufficient to establish a reasonable likelihood or probability, not just a possibility, of exposure to and ingestion of lead at the subject property." (Citation omitted). Rowhouses notes that, where there are multiple possible exposures to lead and no direct evidence of lead-based paint, a plaintiff must rule out other reasonably probable sources to demonstrate that it was reasonably probable that the subject property contained lead-based paint. Rowhouses maintains that Smith failed to eliminate other reasonably probable sources of lead exposure, namely, the Monroe Street Property and the Ashland Avenue Property.

Smith responds that the circuit court erred in granting summary judgment by not considering the totality of the evidence and by ruling that the only evidence that she had produced to support the existence of lead-based paint at the Oliver Street Property was the age of the house. Smith contends that she produced sufficient circumstantial evidence, to a "reasonable likelihood or probability, and not a mere possibility[,]" demonstrating that the Oliver Street Property contained lead-based paint that caused her injury. Smith points out that a plaintiff in a lead-based paint case needs only to produce sufficient circumstantial evidence to rule out other reasonably probable sources—as opposed to all possible sources—of lead exposure. Stated otherwise, Smith observes that a plaintiff is not required to eliminate or rule out every possible source of lead exposure, and instead is required only to produce evidence from which a trier of fact could eliminate all reasonably probable identified sources of lead exposure, aside from the subject property. Smith asserts that,

- 14 -

based on the totality of the evidence presented in this case, a trier of fact could conclude that the other properties in which she resided or visited were not reasonably probable sources of her lead exposure and that the Oliver Street Property was the only reasonably probable source of her lead exposure.

In a reply brief, Rowhouses contends that the circumstantial evidence presented by Smith does not rise above the level of speculation and conjecture, and that Plater's "self-serving testimony" that properties other than the Oliver Street Property were in good condition—*i.e.*, did not contain deteriorated paint—"cannot be enough to both establish the existence of lead-based paint at one property and rule it out at another."

**Standard of Review**

A trial court's grant of summary judgment is appropriate where "there is no genuine dispute as to any material fact and [] the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. R. 2-501(f). An appellate court reviews without deference a trial court's grant of summary judgment. See Hamilton, 439 Md. at 522, 96 A.3d at 726 ("[T]he standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct, and is subject to no deference." (Citations and internal quotation marks omitted)). To that end:

> [I]n reviewing a grant of summary judgment, [the appellate court] review[s] independently the record to determine whether the parties generated a [genuine] dispute of material fact[,] and, if not, whether the moving party was entitled to judgment as a matter of law. [The appellate court] review[s] the record in the light most favorable to the non-moving party[,] and construe[s] any reasonable inferences that may be drawn from the well-plead facts against the moving party.

Id. at 522, 96 A.3d at 726-27 (citations omitted). Moreover, "to defeat a motion for

- 15 -

summary judgment, the opposing party must show that there is a genuine dispute as to a material fact by proffering facts [that] would be admissible in evidence." Id. at 522, 96 A.3d at 727 (citation omitted).

## Causation in Lead-Based Paint Cases

In Hamilton, id. at 523-24, 96 A.3d at 727, this Court defined negligence as follows:

Generally, to state a claim for negligence[,] a party must show 1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty.

(Brackets, citation, and internal quotation marks omitted). As to proximate cause, in Hamilton, id. at 527, 96 A.3d at 729-30, this Court stated:

It is fundamental that[,] in a negligence action[,] the plaintiff has the burden of proving all [of] the facts [that are] essential to constitute the cause of action. One element of a negligence case is that the defendant's negligence was a proximate cause of the accident or injury. The inquiry here focuses on causation in fact, one aspect of proximate cause, concerned with the more fundamental (and some have thought metaphysical) inquiry of whether [the] defendant's conduct actually produced an injury.

(Citations and internal quotation marks omitted). As to the type of evidence—direct, circumstantial, or a combination of both—that a plaintiff may use to prove causation in fact, as we did in Hamilton, id. at 527-25, 96 A.3d at 730, we look to Peterson v. Underwood, 258 Md. 9, 17, 264 A.2d 851, 855 (1970), in which this Court explained:

If lay testimony together with reasonable inferences do[] not directly show [a] causal relationship (such as a witness's observing a brick hurled through a plate glass window) it may be shown in a number of other ways. The most familiar method today is through the opinion of [an] expert who states that, based on facts in evidence, X was the efficient cause of the injury. Such opinion testimony is not always required, and the plaintiff produces legally sufficient proof to get to the jury once he [or she] shows [that] it is more

- 16 -

probable than not that [the] defendant's act caused his [or her] injury. This does not mean [that the] plaintiff is required to exclude every other possible cause of the accident. But[,] where [the] plaintiff[,] by his [or her] own evidence[,] shows two or more equally likely causes of the injury, for only one of which [the] defendant is responsible, [the] plaintiff can[]not recover. The situation before us is somewhat analogous, except that[,] instead of showing two evenly balanced probable causes, [the] plaintiff has shown none.

In the trial below[, the] plaintiff apparently relied on an inference that [the] defendants' acts were the cause or proximate cause of the injury. An 'inference' is a deduction or conclusion [that] reason and common sense lead a jury to draw from the facts [that were] prove[n]. This attempted reliance amounts to proof of causation by circumstantial rather than direct evidence. In accordance with the general rules stated above, this type of evidence is not inherently insufficient; all that is necessary is that it amount to a reasonable likelihood or probability rather than a possibility.

(Citations omitted). Where the plaintiff offers "no direct explanation of the cause of the accident," the plaintiff is "compelled to rely entirely on [] inference[s]." Id. at 18-19, 264 A.2d at 856. "The validity of an inference depends on commonly experienced relationships of acts and forces[,]" and "depends on logical deduction from an established act." Id. at 18, 19, 264 A.2d at 856. In Peterson, id. at 21, 264 A.2d at 857, this Court recognized that "[t]here are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability [that is] claimed by the plaintiff does not need to be established by expert testimony." (Citation and internal quotation marks omitted). Three circumstances where expert testimony is not needed include: (1) "when the disability develops coincidentally with, or within a reasonable time after, the negligent act"; (2) "where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it"; and (3) "where the cause of the injury relates to matters of common experience, knowledge, or observation of lay[people]." Id. at 21, 264 A.2d at 857

- 17 -

(citation and internal quotation marks omitted).

Turning to causation in lead-based paint cases in Maryland, because the causation analysis in such cases has evolved over the last several years, we review, in some detail, the relevant case law on the topic, beginning with Dow v. L & R Props., Inc., 144 Md. App. 67, 796 A.2d 139 (2002). In Dow, id. at 68-69, 76, 796 A.2d at 140, 144, the Court of Special Appeals held that the trial court erred in granting summary judgment in favor of the defendant, a rental property management company, where there was circumstantial evidence from which a trier of fact could infer the presence of lead-based paint at the subject property and that the subject property was the "only possible source" of the child's lead exposure. In Dow, id. at 69, 796 A.2d at 140, the plaintiffs alleged that the child lived at the subject property, which contained chipping and flaking lead-based paint, which caused the child's injury when she ate paint chips. The defendant moved for summary judgment, arguing that there was no evidence of lead-based paint at the subject property, and pointing out that the plaintiffs had not designated an expert to testify that lead-based paint existed at the subject property and had not tested for lead-based paint in the subject property's interior. See id. at 70, 796 A.2d at 140-41. The plaintiffs responded by presenting evidence that the subject property had been built in 1935, and contending that there was a statutory presumption that houses that were built before 1950 contained lead-based paint. See id. at 70, 796 A.2d at 141. The plaintiffs further argued that they had lived in the subject property while it contained chipping and peeling paint, and that the child had had a habit of placing her hands and fingers in her mouth and playing at or near areas of chipping and peeling paint. See id. at 70-71, 796 A.2d at 141.

Later in the litigation, the child's mother filed an affidavit in which she averred that the child had lived at the subject property from age two months to almost five years, and that the child had not lived at any other residence or visited or spent nights at any other residence during that time period. See id. at 71, 796 A.2d at 141-42. The mother further averred that she saw the child place paint chips from the interior of the subject property into her mouth. See id. at 71-72, 796 A.2d at 142. According to the mother, the child did not have contact with other items that were known to contain lead, such as old battery casings, naval paint, or fishing weights, and the child did not play outside in the dirt while they resided at the subject property. See id. at 72, 796 A.2d at 142. The trial court granted the motion for summary judgment, and observed that the subject property had never been tested for lead-based paint, nor had a violation notice addressing the issue of lead-based paint ever been issued for the subject property. See id. at 72, 796 A.2d at 142.

On appeal, the plaintiffs conceded that there was no direct evidence of lead-based paint at the subject property, but argued that they had presented sufficient circumstantial evidence that the paint at the subject property was lead-based paint. See id. at 73-74, 796 A.2d at 143. The Court of Special Appeals agreed and held that, "[v]iewing the circumstantial evidence and the inferences that could be drawn therefrom in the light most favorable to [the plaintiffs] as the non-moving party, [the Court was] satisfied that [the plaintiffs] could properly establish that the paint in question was lead[-]based and thus caused [the child]'s alleged injuries." Id. at 74-75, 796 A.2d at 143. As to circumstantial evidence of causation, the Court of Special Appeals stated:

There is no requirement that, in a negligence suit, the matter of causation . .

. be prove[n] by direct and positive proof to an absolute certainty. Circumstantial evidence may support a negligence determination if it amounts to a reasonable likelihood or probability rather than a possibility. Indeed, Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. . . . Of course, causation evidence that is wholly speculative is not sufficient.

Id. at 75, 796 A.2d at 143-44 (citations, brackets, and internal quotation marks omitted)

(ellipses in original). Turning to the case before it, the Court of Special Appeals concluded:

If believed, the evidence offered by [the plaintiffs] in opposition to the motion for summary judgment could establish that the chipping and peeling paint inside [the subject property] was **the only possible source** of [the child]'s lead poisoning. [The mother]'s affidavit indicates that [the child] did not spend time anywhere else and was never exposed to any other sources of lead. That, coupled with the undisputed fact that homes [that were] built before 1950 often contain lead-based paint, could indeed support an inference that the paint in question contained lead. Under the circumstances, the trial court erred in granting the motion for summary judgment.

Id. at 76-77, 796 A.2d at 144-45 (citations an paragraph break omitted) (emphasis added).[9]

A decade later, in Taylor v. Fishkind, 207 Md. App. 121, 150, 124, 142, 146, 51 A.3d 743, 761, 745, 755, 758 (2012), cert. denied, 431 Md. 221, 64 A.3d 497 (2013), the Court of Special Appeals held, in relevant part, that the trial court was correct in granting summary judgment in the property owners' favor, where "the only evidence that [the

---

[9]In Dow, 144 Md. App. at 74, 796 A.2d at 143, the Court of Special Appeals declined to address the alleged existence of a statutorily-created evidentiary presumption that homes that were built before 1950 contain lead-based paint, observing that no Maryland appellate court had "ever interpreted the statutes regarding lead-based paint to create such a presumption." The Court of Special Appeals stated: "To the contrary, th[e] Court [of Special Appeals] ha[d] commented, in *dicta*, 'Obviously, the mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency.'" Id. at 74, 796 A.2d at 143 (quoting Davis v. Goodman, 117 Md. App. 378, 393, 700 A.2d 798, 805 (1997)).

plaintiff] was exposed to lead at [the subject property] was her elevated blood[-]lead level while living at th[e] property" and where the plaintiff failed to "rule out all other sources for her lead exposure." The plaintiff resided at one property for approximately two-and-a-half years before moving to the subject property, where she lived for just over a year before moving to a third property, where she resided for ten years. See id. at 125, 51 A.3d at 745. On three different occasions spanning a year and a half, the plaintiff's blood-lead level was shown to be elevated during tests, two of which occurred while the plaintiff was living in subject property. See id. at 125-26, 51 A.3d at 745-46.

A lead-based paint inspection conducted during discovery demonstrated that only an exterior window apron on the front of the subject property, with intact paint, tested positive for the presence of lead-based paint. See id. at 128-29, 51 A.3d at 747-48. No interior surfaces were tested for the presence of lead-based paint because the inspector was unable to obtain access to the interior. See id. at 127 n.5, 51 A.3d at 747 n.5. The plaintiff's mother testified at her deposition that the plaintiff put paint chips into her mouth as a child while living at the subject property. See id. at 129, 51 A.3d at 748. The mother later submitted an affidavit, averring that she observed chipping and flaking paint at the subject property, and that she saw the plaintiff with paint chips and dust on her hands and in her mouth while they lived at the subject property. See id. at 129, 51 A.3d at 748.

The plaintiff designated a pediatrician as an expert in medical causation; in a "causation report," the pediatrician opined that the plaintiff was exposed to lead at the first two properties in which she had resided, including the subject property; the pediatrician based her opinion on "the age of the dwellings, the described conditions of the [subject

property], the detection of lead[-based paint on] an exterior window apron of [the subject property,] and [the plaintiff]'s blood[-]lead levels while living at each dwelling." Id. at 124, 129-30, 51 A.3d at 745, 748. The doctor further stated that the dwellings were in an area "known to contain lead[-based] paint" and of an "age to most probably contain lead[-]based paint." Id. at 130, 51 A.3d at 748. At her deposition, the pediatrician admitted that there was no blood-lead level data for a period of approximately a year and a half immediately preceding the time when the plaintiff moved into the subject property. See id. at 131, 51 A.3d at 749. The pediatrician was unable to state whether the plaintiff's blood-lead level rose while she resided in the subject property, acknowledging that the "only thing [that she] kn[e]w [wa]s that [the plaintiff] was living there when [her blood-lead level] was found to be up." Id. at 132, 51 A.3d at 750. The pediatrician agreed that the circumstance that the plaintiff had an elevated blood-lead level while residing at the subject property was not proof that the plaintiff had been exposed to lead at the subject property, as the lead could have been in her body "from some other source prior to the time that she moved in[.]" Id. at 133, 51 A.3d at 750. In many instances throughout her deposition, the pediatrician responded along the lines of "I don't know" when asked questions by the defendant's counsel. Id. at 131-33, 51 A.3d at 749-50.

The defendants, the owners of the subject property, filed a motion for summary judgment, arguing that the pediatrician's testimony was inadmissible because she lacked an adequate factual basis to support her opinion that the plaintiff had been exposed to lead-based paint at the subject property. See id. at 133, 51 A.3d at 750-51. The trial court granted the motion for summary judgment, ruling that "[t]he evidence in th[e] case d[id]

not come close to the kind of circumstantial evidence . . . found sufficient in *Dow*[, 144 Md. App. at 76-77, 796 A.2d at 144-45,]" and ruling that the pediatrician lacked an adequate factual basis to say with "a reasonable degree of medical certainty that [the subject property] was a substantial factor in contributing to [the p]laintiff's injury, nor [wa]s there a basis to say that [the subject property] was a lead source." Taylor, 207 Md. App. at 136, 51 A.3d at 752.

The Court of Special Appeals concluded that the trial court was correct in determining "that the circumstantial evidence supporting [the pediatrician]'s opinion amounted to no more than a possibility that [the plaintiff] was exposed to lead-based paint at" the subject property. Id. at 142, 51 A.3d at 756. Of significance was the pediatrician's inability to rule out other sources of lead or to conclude that the plaintiff's blood-lead level rose while she resided in the subject property. See id. at 142, 51 A.3d at 755. Notably, the plaintiff had alleged that she had been exposed to lead-based paint at two properties; the Court of Special Appeals concluded that there was insufficient evidence to prove that the subject property was "the only possible source of [the plaintiff]'s elevated blood[-]lead level[,]" given the pediatrician's deposition testimony that the plaintiff's elevated blood-lead level at the subject property "could have been the result of lead that was already in her body from a source prior to when she moved to" the subject property. Id. at 146, 51 A.3d at 758 (emphasis omitted). As to the age of the subject property, the Court stated that age alone is not enough to support a conclusion that a house contains lead-based paint because there is no presumption that old houses contain lead-based paint. See id. at 143, 51 A.3d at 756.

- 23 -

In Taylor, id. at 145-46, 51 A.3d at 757-58, the Court of Special Appeals distinguished Dow, 144 Md. App. at 69, 796 A.2d at 140, which involved only one property, noting that, in the plaintiff's case, she had alleged that she had been exposed to lead-based paint at two properties:

> Because [the plaintiff] claims that she was exposed to lead-based paint at two properties, a[n] evidentiary showing [similar to that in *Dow*] is insufficient to prove that [the subject property] was *the only possible source* of [the plaintiff]'s elevated blood[-]lead level. Here, the evidence is inconclusive as to the source of [the plaintiff]'s lead exposure. It is entirely possible from the evidence presented that [the plaintiff] was exposed to lead-based paint at [another property] and not at [the subject property]. The affidavit provided by [the plaintiff]'s mother, if believed, eliminates other residences where [the plaintiff] stayed as possible lead sources, but it does not eliminate [the other property] as a possible lead source. Furthermore, [the pediatrician] conceded in her deposition that [the plaintiff]'s elevated blood[-]lead level at [the subject property] could have been the result of lead that was already in her body from a source prior to when she moved to [the subject property]. Therefore, more is required to support [the pediatrician]'s opinion that [the plaintiff] was exposed to lead-based paint at [the subject property] because, unlike in *Dow*, [the plaintiff] could not rule out all other sources for her lead exposure.

(Emphasis in original). The Court of Special Appeals stated that the plaintiff had "failed to rule out" the other property, "did not have documented blood[-]lead levels that rose while she lived at" the subject property, and had not had the interior of the subject property tested for lead-based paint. Taylor, 207 Md. App. at 147, 51 A.3d at 758. Accordingly, the Court of Special Appeals concluded:

> In light of the facts before the [trial] court, we cannot conclude that it abused its discretion when it ruled that [the pediatrician]'s testimony was inadmissible because she lacked an adequate factual basis to support her conclusion that [the plaintiff] was exposed to lead-based paint at [the subject property]. [The pediatrician] testified at her deposition that she did not know if [the plaintiff]'s blood[-]lead level rose while she lived at [the property], and that it was possible that [the plaintiff]'s elevated blood[-]lead level, when

she moved to [the subject property], was the result of a prior exposure. In fact, [the plaintiff]'s complaint alleges that she had a prior exposure to lead-based paint at [another property]. Additionally, [the plaintiff]'s only evidence that [the subject property] contained lead-based paint was the age of the house and the presence of lead[-based paint] on one component of the exterior of the house. We conclude that, on the basis of [the doctor]'s testimony and the facts before the [trial] court, a reasonable person could find that [the plaintiff]'s injuries could have been caused by exposure to lead-based paint at [the other property] rather than at [the subject property]. Therefore, the [trial] court did not abuse its discretion in excluding [the pediatrician]'s testimony.

Id. at 147-48, 51 A.3d at 759. Moreover, because the plaintiff had "relied exclusively on [the pediatrician]'s testimony to establish that exposure to lead-based paint at [the subject property] caused [her] injuries[,]" and because the trial court had not abused its discretion in excluding the doctor's testimony, the Court of Special Appeals held that the grant of summary judgment in the defendants' favor was correct, as the plaintiff "was unable to state a claim for negligence[.]" Id. at 148, 51 A.3d at 759.

In Ross v. Housing Auth. of Balt. City, 430 Md. 648, 667-69, 63 A.3d 1, 12-13 (2013), for the first time, this Court discussed causation in lead-based paint cases, stating:

> This Court has not previously undertaken an examination of causation in the context of a case involving injuries allegedly due to lead[-based] paint exposure. . . . [T]he Court of Special Appeals [has] stated that causation in lead[-based] paint cases may be proven by showing that the defendant's negligence was a "substantial factor" in causing the plaintiff's injury. That conclusion was derived from past decisions of this Court applying that standard in other contexts and the Restatement 2d of Torts § 431. This Court has previously suggested in dicta that it agrees with that analysis.

> The theory of causation presented in this case can be conceived of as a series of links: (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood[-]lead levels[;] and (3) the link between those blood[-]lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing [the plaintiff]'s alleged injures, the [subject

property] must have been a source of [the plaintiff]'s exposure to lead, that exposure must have contributed to the elevated blood[-]lead levels, and the associated increase in blood[-]lead levels must have been substantial enough to contribute to her injuries.

Expert opinion testimony could be helpful in establishing any of the links and might sometimes be essential in proving the second and third links. . . .

In our view, the link between a defendant's property and a plaintiff's childhood exposure to lead[-based] paint and [lead] dust may be established through circumstantial evidence, even if expert opinion testimony is not available.

(Citations and footnotes omitted). In Ross, id. at 662-63, 63 A.3d at 9-10, this Court held that the trial court did not abuse its discretion in ruling that that the plaintiff's medical expert lacked qualifications and an adequate factual basis to render an opinion as to the source of the plaintiff's lead exposure, and in therefore excluding the plaintiff's medical expert's opinion that the subject property was the source of the plaintiff's lead exposure. Nevertheless, we concluded: "The exclusion of [medical] expert opinion testimony identifying [the subject] property as the source of [the plaintiff]'s lead exposure does not preclude [the plaintiff] from establishing that link by circumstantial evidence." Id. at 671, 63 A.3d at 14-15. Accordingly, we remanded the case to the trial court to provide "the parties [with] the opportunity to review the evidence and argue whether, taking the evidence and inferences in the light most favorable to [the plaintiff], there remains a fatal gap in her proof" given the exclusion of the plaintiff's medical expert's testimony. Id. at 671, 63 A.3d at 14.

Just over two months later, in West v. Rochkind, 212 Md. App. 164, 166-67, 176, 66 A.3d 1145, 1146-47, 1152, cert. denied, 435 Md. 270, 77 A.3d 1086 (2013), the Court

of Special Appeals held that a trial court did not err in granting summary judgment in favor of the defendants, owners and operators of a property in which the plaintiff resided from his birth until he was two-and-a-half years old, and in which the plaintiff allegedly sustained injuries from ingesting lead-based paint, where the circumstantial evidence demonstrated that the plaintiff "may have been exposed to lead" at numerous residences. In West, id. at 166, 66 A.3d at 1146, there was no direct evidence of lead-based paint at the defendants' property because no tests for lead-based paint had ever been conducted, and the defendants' property had been razed.  Accordingly, the plaintiff's case rested on the following circumstantial evidence: (1) from birth to age six, the plaintiff "either resided or spent substantial amounts of time at a variety of different residences[,]" including the defendants' property and three other properties; (2) three blood-lead level tests in 1990 and 1991, which listed the defendants' property as the plaintiff's address, showed that the plaintiff had an elevated blood-lead level; (3) three blood-lead level tests in 1992, which listed another property as the plaintiff's address, showed that the plaintiff had an elevated blood-lead level; (4) at her deposition, the plaintiff's mother initially testified that she lived at yet another address when the plaintiff was born, and that the plaintiff lived at that address, but later testified that the plaintiff lived with his grandparents at the defendants' property immediately after birth; (5) for the first eleven months of the plaintiff's life, the defendants were not yet the owners of the defendants' property; (6) the plaintiff's mother testified that, although she lived at various other properties, she provided her parents' address (the defendants' property) instead of her own when seeking medical treatment; and (7) a report from Kennedy Krieger Institute stated that the plaintiff resided with his mother

until he was five years old, "effectively exclud[ing the defendants' property] as a place of residence, for[,] by the time that [the plaintiff] was five[,] his grandparents had moved away from" the defendants' property. Id. at 166-68, 66 A.3d at 1146-47. The defendants moved for summary judgment, and the trial court granted the motion. See id. at 168, 66 A.3d at 1147.

On appeal, relying on Dow, 144 Md. App. at 76-77, 796 A.2d at 144-45, the plaintiff contended that he had produced sufficient circumstantial evidence that the defendants' property contained lead-based paint. See West, 212 Md. App. at 169-70, 66 A.3d at 1148. The Court of Special Appeals agreed with the general principle "that a negligence case may be proven using only circumstantial evidence, so long as it creates a reasonable likelihood or probability rather than a possibility supporting a rational inference of causation, and is not wholly speculative." Id. at 170-71, 66 A.3d at 1149 (citations and internal quotation marks omitted). The Court explained:

> We are not proposing the process of elimination as a necessary standard of proof on the ultimate issue of tortious liability. We are dealing, rather, with an instance where the use of the process of elimination was required to establish a constituent fact which is a necessary part of that circumstantial evidence. We are not juxtaposing 1) exclusivity demanded by the process of elimination with 2) probability established by circumstantial evidence as opposing standards of proof. The exclusivity required to infer a cause from an effect comes into play only to establish one of the facts that, if established, may then enter into the circumstantial mix.

Id. at 171, 66 A.3d at 1149.

Applying Dow, 144 Md. App. at 76-77, 796 A.2d at 144-45, and Taylor, 207 Md. App. at 150, 51 A.3d at 760-61, the Court concluded, however, that the plaintiff had not shown the exclusivity that was needed to demonstrate that the defendants' property

contained lead-based paint, stating:

> A lead[-based] paint plaintiff may, of course, establish a prima facie case of negligence based solely on circumstantial evidence. In a case such as this, however, where there was no direct evidence that [the defendants' property] even contained lead[-based] paint, [the plaintiff] may [] rely on that critical fact, as a necessary part of his circumstantial evidence, [only] if he can show by the process of elimination that [the defendants' property] was the only possible cause for the critical effect of lead poisoning. We may [] infer the existence of lead[-based] paint at [the defendants' property] from [the plaintiff]'s condition [only] if lead[-based] paint at [the defendants' property] is shown to have been the only possible explanation for [the plaintiff]'s condition.

West, 212 Md. App. at 175, 66 A.3d at 1151. The Court of Special Appeals interpreted Dow, 144 Md. App. at 76-77, 796 A.2d at 144-45, as holding that, "even in the absence of direct proof, the presence of lead[-based] paint at a particular site can be inferred by the process of elimination, but only if we have 1) the effect of lead poisoning in the plaintiff and 2) the fact that the site in question was the exclusive possible source of the plaintiff's lead exposure." West, 212 Md. App. at 176, 66 A.3d at 1152. Because the plaintiff could show, "[a]t best," "that he may have been exposed to lead[-based paint] at any or all of the three or four residences where he spent substantial time as a child[,]" the Court concluded that the plaintiff "failed to establish the threshold premise that lead[-based paint] was even present in the paint at" the defendants' property. Id. at 176, 66 A.3d at 1152.

Shortly thereafter, in Hamilton v. Dackman, 213 Md. App. 589, 591-92, 605, 75 A.3d 327, 328, 336 (2013), cert. denied, 439 Md. 329, 96 A.3d 145 (2014), the Court of Special Appeals affirmed the trial court's grant of summary judgment in favor of the defendants, who owned and operated a house at which the plaintiff alleged that he had been exposed to lead-based paint, where the circumstantial evidence produced showed, at most,

a possibility, not a probability, that the defendants' property was a source of the plaintiff's lead exposure. In Dackman, id. at 592, 75 A.3d at 328, the plaintiff resided at three different properties from birth to age six. None of the three properties, however, was the basis for the plaintiff's claim of lead poisoning; rather, the plaintiff alleged that he had been injured at the defendants' property, where the plaintiff's father lived and where the plaintiff "often visited and sometimes stayed overnight." Id. at 592, 75 A.3d at 328.

During discovery, the plaintiff submitted a report in which Arc Environmental, Inc. stated that testing for lead-based paint on eight exterior surfaces on the defendants' property revealed that one surface—the rear exterior door transom—tested positive for the presence of lead-based paint; the report did not indicate whether the paint on the rear exterior door transom was intact or deteriorated. See id. at 594-95, 75 A.3d at 330. The plaintiff also identified as expert witnesses: Dr. Simon (the same Dr. Simon as in this case) and Dr. Jacalyn Blackwell-White, M.D. ("Dr. Blackwell-White"), a board-certified pediatrician, who had been the medical expert in Ross, 430 Md. at 656, 63 A.3d at 5. See Dackman, 213 Md. App. at 595, 597, 75 A.3d at 330, 331. Dr. Simon

> opined that the [defendants'] property was a source of [the plaintiff]'s exposure to lead-based paint. He assumed from the age of the [defendants'] property that it contained lead-based paint . . . . When asked to describe the basis for his opinion that the [defendants'] property contained lead-based paint, Dr. Simon admitted that he assumed the presence of lead[-based paint] both there and at [another] property from the properties' age[.]

Id. at 595-96, 75 A.3d at 330. Dr. Blackwell-White opined that the defendants' property and two other properties "were sources of lead-based paint and that [the plaintiff]'s injuries were caused by exposure at the sites[.]" Id. at 597, 75 A.3d at 331. As Dr. Simon did, Dr.

Blackwell-White explained that the basis for her opinion about the defendants' property and one of the other properties was the age of the properties, stating: "Both properties were old[,] and[,] in the absence of physical lead[-based paint] assessment information, are presumed to have contained lead[-]based paint." Id. at 597, 75 A.3d at 331. At her deposition, Dr. Blackwell-White testified that she could not rule out the other property and was, in fact, ruling it in because that property "was an older property in disrepair[ a]nd [] was the property of residence when the elevated [blood-]lead levels were found." Id. at 600, 75 A.3d at 333.

The defendants moved for summary judgment, contending "(1) that [the plaintiff] had failed to provide either direct or circumstantial evidence demonstrating the presence of lead[-based paint] at the [defendants'] property during the relevant time period, and (2) that he could not rule out other properties as potential sources." Id. at 600, 75 A.3d at 333. The defendants also argued that, because the plaintiff's experts "admitted [that] they were unable to rule out other sources of lead exposure or other properties as containing lead[-based paint], they lacked an adequate factual basis to conclude that the [defendants'] property was *the* source of his lead exposure." Id. at 600-01, 75 A.3d at 333 (emphasis in original). The trial court granted the motion for summary judgment, ruling that the plaintiff "had not produced evidence sufficient to establish a *prima facie* case of lead exposure at the [defendants'] property [], and the [trial] court declined to allow [the plaintiff] to use experts to fill the causal gaps." Id. at 591-92, 75 A.3d at 328.

The Court of Special Appeals held that the plaintiff had failed to offer "legally sufficient evidence of causation to connect his injuries to the [defendants'] property[,]"

- 31 -

explaining:

> [T]he evidence proffered here would have allowed a jury at most to find a *possibility* that the circumstantially-established lead exposure at the [defendants'] property was a source of [the plaintiff]'s alleged injuries. That is not enough: a plaintiff must establish, consistent with the standards recently clarified by the Court of Appeals in *Ross*, 430 Md. 648, 63 A.3d 1, a *probability* that a property exposed him or her to injury-causing lead[-based] paint. . . . [W]e disagree that a plaintiff *necessarily* must eliminate *all* other possible sources of lead to proceed—a plaintiff could, if the facts allowed, establish a probability that more than one property is a source of injury. But[,] by the time [that] this case reached summary judgment, [the plaintiff]'s case was down to one property, and his evidence as to that property fell short, both in terms of the tangible and circumstantial evidence and because his proffered expert testimony was grounded almost entirely on assumptions.

Dackman, 213 Md. App. at 605, 75 A.3d at 336 (emphasis in original). As to the plaintiff's experts, the Court of Special Appeals noted that "an expert cannot transform thin evidence or assumptions into viable causal connections simply by labeling them an expert opinion." Id. at 608, 75 A.3d at 338. The Court of Special Appeals explained further that Maryland courts "have for some time required more of a plaintiff than simply a showing that he [or she] lived in an old house in an area where lead-based paint historically was present." Id. at 612, 75 A.3d at 340. Thus, "a plaintiff bears the burden to establish the presence of lead in the child's environment, and cannot just assume it merely from the age or location of the house." Id. at 612, 75 A.3d at 340 (citations omitted). Applying those principles, the Court concluded that the plaintiff's experts did not possess the necessary qualifications or an adequate factual basis to render an opinion as to the source of the plaintiff's lead exposure. See id. at 614-15, 75 A.3d at 341-42.

The Court of Special Appeals held that, absent expert opinion testimony, the only

evidence of lead-based paint at the defendants' property "was the lone test on a transom over the rear exterior door of the house[,]" which was not sufficient to show that the interior of the defendants' property contained lead-based paint. Id. at 617, 75 A.3d at 343. The Court noted that other evidence "diminished" the likelihood that the defendants' property harmed the plaintiff, including that, in answers to interrogatories, the plaintiff stated that he "rarely played in the back yard" of the defendants' property and that there was no evidence of any violations of the Baltimore City Housing Code. Id. at 617-18, 75 A.3d at 343-44. Indeed, the Court stated that the factual allegations in the case could, at most, support the possibility that the plaintiff had been exposed to lead-based paint at the defendants' property. See id. at 618, 75 A.3d at 344. The Court concluded that the trial court properly granted summary judgment in the defendants' favor because the plaintiff "was left with no evidence—direct *or* circumstantial—that would establish the [defendants'] property as a probable source of his elevated blood-lead levels, and because his experts could not make evidence out of assumptions[.]" Id. at 619, 75 A.3d at 344 (emphasis in original).

The Court of Special Appeals also commented on whether a plaintiff is required to rule out all other potential sources of lead exposure, stating:

> We did not mean to suggest in *Dow*, [144 Md. App. 67, 796 A.2d 139,] or elsewhere, that plaintiffs must rule out all other potential sources in all cases. That process of elimination revived the plaintiff's case in *Dow*, and[,] on the other hand, the expert's inability to eliminate that uncertainty in *Taylor*[, 207 Md. App. at 142, 51 A.3d at 755-56,] contributed to our holding that summary judgment was appropriate there. *Ross*[, 430 Md. at 670-71, 63 A.3d at 13-15,] went the extra step, too, in suggesting that[,] even though a plaintiff need not produce an expert to establish causation, there are still limits to the inferences in a plaintiff's favor that yet could allow

summary judgment. That suggestion does not mean, though, that[,] as a matter of law, a plaintiff cannot create a genuine [dispute] of [material] fact that a property probably was responsible for something [that was] less than all of a plaintiff's demonstrated lead exposure. To be sure, that would be a hard case—among other things, such a plaintiff would need to produce probability-level evidence as to exposure at each property separately. But the fact that such a case might be hard to prove doesn't make it impossible, and the fact that a lead-exposed child might have lived or spent time in more than one lead-based-painted property should not foreclose that child as a matter of law from pursuing any one of those potential sources—as long as he [or she] is able to *rule in* the subject property in the first place through an appropriate combination of direct or circumstantial evidence establishing the probability of exposure by that plaintiff in that property. We clarify, therefore, that a plaintiff's ability to prove causation through circumstantial evidence is limited by the probability requirement, whatever the factual theory, rather than any requirement to eliminate all other potential sources of exposure. From there, each case stands or falls on the quantum and quality of the evidence [that] a plaintiff is able to produce.

Dackman, 213 Md. App. at 616-17, 75 A.3d at 342-43 (emphasis in original) (some citations, internal quotation marks, and brackets omitted).

Less than a year later, in Hamilton, 439 Md. at 544, 546, 96 A.3d at 740, 741, in an opinion that consolidated two cases, this Court held that the trial courts in the respective cases, the Alston case and the Hamilton case, were correct in granting summary judgment in favor of the defendants because the Alstons and the Hamiltons failed to produce sufficient circumstantial evidence to satisfy the causation element of a *prima facie* negligence case. In Hamilton, id. at 529-30, 96 A.3d at 731, we discussed causation in lead-based paint cases generally, explaining:

> To connect the dots between a defendant's property and a plaintiff's exposure to lead[-based paint], the plaintiff must tender facts admissible in evidence that, if believed, establish two separate inferences: (1) that the [subject] property contained lead-based paint, and (2) that the lead-based paint at the subject property was a substantial contributor to the [plaintiff]'s exposure to lead[-based paint]. At times, these separate inferences may be

drawn from the same set of facts, but parties would do well to remember that these inferences are separate and often will require different evidentiary support.

We then turned our attention to two key cases, Dow, 144 Md. App. 57, 796 A.2d 139, and West, 212 Md. App. 164, 66 A.3d 1145. As to Dow, we stated:

> In sum, the facts in *Dow* showed that (1) the child victim spent most of her time at the subject property[,] where she lived[,] and [she] did not have contact with other possible sources of lead during the relevant period; (2) the child was observed ingesting regularly flaking or chipping paint at that property; (3) the child played frequently in the area of the flaking or chipping paint; and (4) the child had high blood[-]lead levels during that time period, i.e., developed lead poisoning. The [C]ourt [of Special Appeals] concluded that, under those circumstances, there was more than a mere possibility that the house where the child resided *and spent most of her time* was the *only* possible source of the lead exposure. As such, because the child spent almost all of her time at that house, the [C]ourt concluded additionally that it was more than a mere possibility that the house contained lead-based paint. Even though there was no direct evidence at that property, i.e., no scientific testing, it was reasonable to infer that there had to be lead[-based paint] at that property because the child would not have suffered otherwise from lead poisoning. In that sense, the plaintiff eliminated all other possible sources of lead poisoning in order to make reasonable and probable those conclusions. Thus, the [C]ourt drew two necessary, separate inferences on the basis of the same set of facts.

Hamilton, 439 Md. at 531, 96 A.3d at 732 (emphasis in original). As to West, we stated:

> We agree with the *West* [C]ourt's analysis for application to those cases where a plaintiff relies on a *Dow* theory of causation. Under a *Dow* theory of causation, a plaintiff must rule out other reasonably probable sources of lead exposure in order to prove that it is probable that the subject property contained lead-based paint. Where the plaintiff fails to rule out other reasonably probable sources, the necessary inferences for a *Dow* theory of causation cannot be drawn with sufficient validity to allow the claim to survive summary judgment. That certain facts are missing to establish a *Dow* theory of causation, however, does not mean that the lead-poisoned plaintiff has no way to prove circumstantially a *prima facie* negligence case. To the extent that *West* suggests that a lead-[based ]paint plaintiff must exclude all other sources of lead exposure in every instance of circumstantial proof, we do not agree necessarily with that conclusion.

Hamilton, 439 Md. at 536-37, 96 A.3d at 735-36 (citation omitted).

Indeed, we explained that "[a] lead-[based ]paint poisoned plaintiff may prove circumstantially that the subject property contained lead-based paint in a number of ways." Id. at 537, 96 A.3d at 736. One such way to present a *prima facie* negligence case is "to exclude other reasonably probable sources of lead, [] as in *Dow*[.]" Hamilton, 439 Md. at 537, 96 A.3d at 736. We also described an example of another way to present a *prima facie* negligence case, providing an illustration of a row of four row houses, A, B, C, and D, in which row house B, the subject property, is between row house A and row house C, the interiors of which both had tested positive for the presence of lead-based paint; it is unknown whether row house D, on the other side of row house C, contains lead-based paint. See id. at 537, 96 A.3d at 736. We elaborated upon the illustration, stating:

> In this hypothetical, row house "B" is the subject property . . . that a plaintiff hopes to prove, through circumstantial evidence, contains lead-based paint. Perhaps the row house was razed, however, and direct testing is impossible at the time of the litigation. There exists, however, evidence that these four row houses were built at the same time in the 1920[]s and that they were owned as a group by a series of persons or entities through the 1950[]s. Moreover, the City's records reveal that row houses "A" and "C" . . . tested positive previously for lead[-based] paint on the interior of the houses. Thus, in this hypothetical (at least in the absence of evidence of lead abatement measures), the plaintiff is able to present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead[] poisoning.

Id. at 538, 96 A.3d at 736 (footnote omitted). We summarized our reasoning as to the two ways to present a *prima facie* negligence case, stating: "Where a plaintiff who does not produce evidence to support another theory of causation and, instead, relies on a causation

- 36 -

theory similar to that espoused in *Dow*, the validity of the necessary inference is limited to those circumstances where the plaintiff is able also to exclude other reasonably probable sources of lead exposure." Id. at 538, 96 A.3d at 736. We concluded, however, that "*Dow* does not define the only set of circumstantial facts that may satisfy a plaintiff's burden to establish a *prima facie* negligence case for lead [] poisoning." Id. at 542, 96 A.3d at 739. Indeed, "[t]he pertinent question to be asked is whether the particular circumstantial evidence permits an inference or inferences of the desired ultimate fact or facts as a 'reasonable likelihood or probability,' and not a mere 'possibility.'" Id. at 542, 96 A.3d at 739. Thus, we disagreed "with the exclusivity of [the] conclusion" "that the only way to prove a *prima facie* negligence case circumstantially is to eliminate every other reasonable possibility as an alternative source[.]" Id. at 542, 96 A.3d at 739.

Applying the principles distilled from the case law, we then turned to the two cases at issue. As to the Hamilton case, we determined not only that was there no direct evidence that the subject property contained lead-based paint, but also that there was no circumstantial evidence, "as there was in *Dow*, that the [plaintiffs] spent substantially all of their time in one house, the subject property, such that the [trial c]ourt could conclude that a fact-finder could be persuaded that there was a reasonable probability that the subject property contained lead-based paint." Id. at 542-43, 96 A.3d at 739. In the Hamilton case, the plaintiffs presented evidence consisting of: (1) a report regarding exterior surfaces; (2) the mother's statements that the plaintiffs put paint chips in their mouths at the subject property; (3) the plaintiffs' elevated blood-lead levels; and (4) the age of the subject property. See id. at 543, 96 A.3d at 739. While opining that perhaps the subject property

- 37 -

contained lead-based paint, the plaintiffs' experts were unable to rule out two visitation properties as potential sources where some information suggested those properties contained lead-based paint. See id. at 543, 96 A.3d at 739. We explained that "the sole concern should not be that the [plaintiff]s' experts were provided with little information on other potential sources of lead exposure[,]" and instead, "the concern should be that the [plaintiff]s' experts reached the conclusion that the [subject property] contained lead-based paint on a presumption that houses built during a certain time period contain typically lead-based paint." Id. at 544, 96 A.3d at 740. Accordingly, the experts lacked an adequate factual basis "to reach the conclusion that the interior of a specific property contained lead-based paint during the relevant time period." Id. at 544, 96 A.3d at 740.

As to the Alston case, this Court held that the circuit court was correct in granting the defendants' motion for summary judgment because the Alstons argued a Dow theory of causation, yet "failed to eliminate other reasonably probable identified sources of lead exposure." Id. at 546, 96 A.3d at 741. Indeed, the Alstons had failed to meet their burden "to advance a viable theory of causation." Id. at 546, 96 A.3d at 741. In reaching this conclusion, we noted that the trial court had determined that the evidence demonstrated that two properties could have been the source of the Alstons' lead exposure, which was simply not sufficient to establish causation. See id. at 545, 96 A.3d at 741. Thus, although the Alstons had shown that the subject properties had deteriorating paint, and that they had experienced elevated blood-lead levels while living in the subject properties, summary judgment in the defendants' favor was appropriate because the Alstons failed to rule out other reasonably probable sources of lead exposure. See id. at 545-46, 96 A.3d at 740-

41.[10]

**Analysis**

Returning to the instant case, we hold that the circuit court erred in granting summary judgment in Rowhouses's favor as to Smith's negligence claim because, even without direct evidence that the Oliver Street Property contained lead-based paint and without Dr. Simon's expert testimony as to the source of Smith's lead exposure, there was sufficient circumstantial evidence from which a trier of fact could conclude that the Oliver Street Property contained lead-based paint; and, the evidence was sufficient for a jury to conclude that the Oliver Street Property was a reasonable probable source of Smith's lead exposure, and that there were no other reasonably probable sources of lead exposure.

*Reasonable Probable Source*

Before we delve into the sufficiency of the circumstantial evidence that Smith

---

[10]Following our opinion in Hamilton, 439 Md. 501, 96 A.3d 714, in Barr v. Rochkind, 225 Md. App. 336, 345, 124 A.3d 1128, 1133 (2015), cert. denied, No. 545, Sept. Term, 2015, (Md. Feb. 22, 2016), the Court of Special Appeals addressed causation in a lead-based paint case, answering affirmatively an issue that it framed as "whether a lead[-based] paint plaintiff who relies on circumstantial evidence to establish the elements of [his or] her *prima facie* negligence case—including proof that the defendant's property contained lead[-based] paint—has a burden of production to present evidence ruling out any reasonable probability that [his or] her elevated blood[-]lead levels were caused by other potential sources of lead exposure." To the extent that the Court of Special Appeals framed the issue in such a way to state that there is only one way to establish a *prima facie* negligence case using circumstantial evidence, *i.e.*, excluding other reasonably probable sources of lead, such a framing is incorrect under Hamilton. As discussed above, in Hamilton, 439 Md. at 537, 96 A.3d at 736, we explained that excluding other reasonably probable sources of lead is one way—but not the only way—to establish a *prima facie* negligence case. Indeed, we provided an example of another way in which a plaintiff could present sufficient circumstantial evidence that the subject property contained lead-based paint without the need to exclude all other sources of lead exposure. See id. at 537-38, 96 A.3d at 736.

presented, we begin by examining what constitutes a reasonable probable source of lead exposure. As described above, this Court and the Court of Special Appeals have held that circumstantial evidence may be used to establish a *prima facie* negligence case so long as the circumstantial evidence demonstrates that the subject property is a reasonable probable source of lead exposure. See Hamilton, 439 Md. at 542, 96 A.3d at 739 ("The pertinent question to be asked is whether the particular circumstantial evidence permits an inference or inferences of the desired ultimate fact or facts as a 'reasonable likelihood or probability,' and not a mere 'possibility.'"); Dackman, 213 Md. App. at 605, 75 A.3d at 336 ("[A] plaintiff must establish . . . a probability that [the subject] property exposed him or her to injury-causing lead[-based] paint." (Citation omitted)); West, 212 Md. App. at 170-71, 66 A.3d at 1149 ("There is no dispute that a negligence case may be proven using only circumstantial evidence, so long as it creates a reasonable likelihood or probability rather than a possibility supporting a rational inference of causation, and is not wholly speculative." (Citations and internal quotation marks omitted)); Dow, 144 Md. App. at 75, 796 A.2d at 144 ("Circumstantial evidence may support a negligence determination if it amounts to a reasonable likelihood or probability rather than a possibility." (Brackets, citation, and internal quotation marks omitted)). In this case, the parties have raised an issue as to what constitutes a reasonable probable source; accordingly, we attempt to define the phrase "reasonable probability."

We determine that, for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than

"more likely than not,"[11] but more than a mere "possibility." In other words, there are

degrees of probability, with more likely than not having the highest degree of probability,

followed by reasonable probability, followed by mere possibility. In the context of an

alleged Brady violation,[12] and, specifically, whether evidence was material even if helpful

and even if suppressed, in Adams v. State, 165 Md. App. 352, 435-36, 885 A.2d 833, 881-

82 (2005), writing for the Court of Special Appeals, Judge Moylan explained that a

reasonable probability is not synonymous with more likely than not and that more likely

than not is the higher standard:

> An obvious weakness of the term of art "reasonable probability" is that the
> unwary reader may readily confuse it with the informal and commonplace
> notion of "probability." To the untutored ear, probability sounds like
> something that is more likely true than not. As we have analyzed at length,
> however, . . . "reasonable probability" implies no such thing. . . . The Court
> speaks in terms of the familiar, and perhaps familiarly deceptive,
> formulation: whether there is a "reasonable probability" of a different
> outcome if the evidence withheld had been disclosed. The Court rightly
> cautions that the standard intended by these words does not require
> defendants to show that a different outcome would have been more likely

---

[11]Preponderance of the evidence typically is the standard of proof at trial in civil cases. See, e.g., Urban Site Venture II Ltd. P'ship v. Levering Assocs. Ltd. P'ship, 340 Md. 223, 228, 665 A.2d 1062, 1064 (1995) ("In most civil actions, the party having the burden of proof on an issue must prove his or her contention by a fair preponderance of the evidence." (Citations omitted)). Maryland Civil Pattern Jury Instruction 1:12, concerning the burden of proof under the preponderance of the evidence standard, defines a preponderance of the evidence, in part, as something that is "more likely so than not so":

> In order to prove something by a preponderance of the evidence a party must
> prove that it is more likely so than no so. In other words, a preponderance of
> the evidence means such evidence which, when considered and compared
> with the evidence opposed to it, has more convincing force and produces in
> your minds a belief that it is more likely true than not true.

[12]"A Brady violation is a due process violation that occurs when the [S]tate fails to turn over exculpatory evidence." Aguilera v. Wright Cnty, Iowa, 50 F. Supp. 3d 1057, 1059 n.1 (N.D. Iowa 2014) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).

> than not with the suppressed evidence. . . . [T]he continued use of the term "probability" raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, "more likely than not."

(Citations, emphasis, and paragraph breaks omitted). What can be gleaned from the discussion in <u>Adams</u> is that a reasonable probability is less than more likely than not, which is a higher standard to meet. We agree with the general principle that more likely than not implies a higher degree of proof than the standard of reasonable probability. Significantly, for purposes of surviving summary judgment, neither this Court nor the Court of Special Appeals has required a plaintiff in a lead-based paint case to show that it is more likely than not that the subject property contained lead-based paint and is the source of the plaintiff's lead exposure. Rather, as discussed above, at the summary judgment stage, a plaintiff need only show that the subject property is a reasonable probable source of lead exposure.

To that end, we further examine the definition of "reasonable probability." Black's Law Dictionary (10th ed. 2014) defines "probability," in pertinent part, as "[s]omething that is likely; what is likely[.]" Similarly, Merriam-Webster defines "probable" as "likely to be or become true[.]" Probable, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/probable [https://perma.cc/84MQ-2X8H]. "Likely," in turn, means "[a]pparently true . . . ; probable" and "[s]howing a strong tendency; reasonably expected[.]" Likely, Black's Law Dictionary (10th ed. 2014). "Reasonable," on the other hand, means "[f]air, proper, or moderate under the circumstances[.]" Reasonable, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "reasonable" as "not extreme or excessive" and "moderate, fair[.]" Reasonable, Merriam-Webster (2015),

http://www.merriam-webster.com/dictionary/reasonable [https://perma.cc/QE89-RNWD]. Considering theses definitions together, we conclude that a "reasonable probability" is a fair likelihood that something is true. In the context of lead-based paint cases, that means that the subject property is a reasonable probable source of a plaintiff's lead exposure where there is a fair likelihood that the subject property contained lead-based paint and was a source of the lead exposure. Compare Dow, 144 Md. App. at 76, 796 A.2d at 144 (The subject property was a reasonable probable source of the child's lead exposure where the evidence, if believed, demonstrated "that the chipping and peeling paint inside [the subject property] was the only possible source of [the child]'s lead poisoning."), with Taylor, 207 Md. App. at 146, 51 A.3d at 758 (The subject property was not a reasonable probable source of lead exposure where "the evidence [wa]s inconclusive as to the source of [the plaintiff]'s lead exposure" and where "[i]t [wa]s entirely possible from the evidence presented that [the plaintiff] was exposed to lead-based paint at [another property] and not at [the subject property]."), and Hamilton, 439 Md. at 542-43, 96 A.3d at 739 (The subject property was not a reasonable probable source of lead where there was no direct or circumstantial evidence, "as there was in *Dow*, that the children spent substantially all of their time in one house, the subject property, such that the [trial c]ourt could conclude that a fact-finder could be persuaded that there was a reasonable probability that the subject property contained lead-based paint.").

Obviously, by the very nature of the phrase, a "reasonable probability" is not a "certainty," which is "[t]he quality, state, or condition of being indubitable or certain, esp[ecially] upon a showing of hard evidence[,]" and "[a]nything that is known or has been

prove[n] to be true." Certainty, Black's Law Dictionary (10th ed. 2014). Indeed, in a case that is premised on circumstantial evidence, it would be nearly impossible, if not completely impossible, to demonstrate to a certainty that the subject property contained lead-based paint and was a source of the plaintiff's lead exposure.

Also, a "reasonable probability" is more than a mere "possibility." A "possibility" is:

> 1. The quality, state, or condition of being conceivable in theory or in practice; the character of perhaps being, of perhaps existing, or of comporting with physical laws or the laws of reason[.] . . . In this sense, the word often (but not always) conveys a sense of uncertainty or improbability. 2. The chance that something is . . . true, or that something . . . will happen[.]

Possibility, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "possibility" as "a chance that something might exist, happen, or be true[.]" Possibility, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/possibility [https://perma.cc/WD6Y-9JJX]. Thus, something that is possible is less probable than something that is reasonably probable; a possibility is a mere chance that something might be true, as opposed to a fair likelihood that something is true. Establishing a possibility requires a lower quantum of proof or evidence (the showing of a chance, not necessarily a fair likelihood) than establishing a reasonable probability. In that regard, a "reasonable probability" is a higher standard than a "possibility." In the context of lead-based paint cases, any property in which a plaintiff has resided or visited could be a possible source of the plaintiff's lead exposure. However, a possible source does not become a reasonable probable source without additional evidence that elevates the mere chance that the property contained lead-based paint and was a source of lead exposure to the fair likelihood that the

- 44 -

property contained lead-based paint and was a source of lead exposure.

Indeed, reading these definitions together makes it evident that a reasonable probability is less than more likely than not, but more than a possibility. As stated above, in a lead-based paint case, a subject property is a reasonable probable source of a plaintiff's lead exposure where there is a fair likelihood that the subject property contained lead-based paint and was a source of the lead exposure. Now, keeping in mind what a reasonable probable source is, and that it is not synonymous with a possible source or a source that is more likely than not, we consider whether circumstantial evidence may be used both to establish the subject property as a reasonable probable source and to rule out other reasonably probable sources. We hold that it can at the summary judgment stage and explain.

Under existing case law, as discussed in detail above, a plaintiff may use circumstantial evidence to establish that the subject property contained lead-based paint and is a reasonable probable source of lead exposure. The case law is clear that, when proceeding under a <u>Dow</u> theory of causation—*i.e.*, using circumstantial evidence to establish the subject property as a reasonable probable source of lead exposure—a plaintiff must rule out other reasonably probable sources.[13] <u>See, e.g.</u>, <u>Hamilton</u>, 439 Md. at 538, 96

---

[13]In <u>Hamilton</u>, 439 Md. at 537-38, 96 A.3d at 736, we recognized that, under certain circumstances, a plaintiff may establish a *prima facie* negligence case using circumstantial evidence even without excluding other reasonably probable sources of lead—*i.e.*, even without proceeding under a <u>Dow</u> theory of causation—and provided the example of the four row houses, in which the subject property was immediately between two houses that had also been built in the 1920s and that had both tested positive for the presence of lead-based paint. We stated that, in that hypothetical, the plaintiff could "present circumstantial

A.3d at 736 ("Where a plaintiff who does not produce evidence to support another theory of causation and, instead, relies on a causation theory [that is] similar to that espoused in *Dow*, the validity of the necessary inference is limited to those circumstances where the plaintiff is able also to exclude other reasonably probable sources of lead exposure."); West, 212 Md. App. at 175, 66 A.3d at 1151 ("[W]here there was no direct evidence that [the defendants' property] even contained lead[-based] paint, [the plaintiff could] rely on that critical fact, as a necessary part of his circumstantial evidence, [only] if he [could] show by the process of elimination that [the defendants' property] was the only possible cause for the critical effect of lead poisoning."); Taylor, 207 Md. App. at 146, 51 A.3d at 758 ("[M]ore is required to support [the pediatrician]'s opinion that [the plaintiff] was exposed to lead-based paint at [the subject property] because, unlike in *Dow*, [the plaintiff] could not rule out all other sources for her lead exposure.").

However, the case law has not discussed what exactly is required to rule out other reasonably probable sources. Here, we hold that, where a plaintiff proceeds under a Dow theory of causation, just as circumstantial evidence may be used to rule in the subject property as a reasonable probable source of lead exposure, circumstantial evidence may also be used to rule out another property as a reasonable probable source of lead exposure. In other words, to rule out or eliminate other reasonably probable sources of lead exposure, a plaintiff does not need to produce direct evidence that another property did not contain

_____

evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead[] poisoning." Hamilton, 439 Md. at 538, 96 A.3d at 736 (footnote omitted).

lead-based paint—through, for example, a test for lead-based paint. Requiring direct evidence to rule out other reasonably probable sources of lead is simply too high a burden of production on a plaintiff in a lead-based paint case, especially at the summary judgment stage. Accordingly, we conclude that a plaintiff need only produce circumstantial evidence that, if believed, would rule out other reasonably probable sources of lead. At the summary judgment stage, although expert witness testimony may be helpful to rule out another property as a reasonable probable source, it is not necessary. Cf. Ross, 430 Md. at 669, 63 A.3d at 13 ("[T]he link between a defendant's property and a plaintiff's childhood exposure to lead[-based] paint and [lead] dust may be established through circumstantial evidence, even if expert opinion testimony is not available.").

Instead, circumstantial evidence that rules out other reasonably probable sources may take the form of a lay witness's testimony at a deposition or averment in an affidavit that a property other than the subject property did not contain deteriorated, chipping, or flaking paint and was in good condition. In essence, in that situation, the witness's testimony or affidavit is circumstantial evidence that the other property did not contain a lead-based paint hazard.[14] A lay witness's testimony or affidavit may also rule out other

_____

[14]The Code of Federal Regulations defines a lead-based paint hazard as:

(1) Any lead-based paint on a friction surface that is subject to abrasion and where the lead dust levels on the nearest horizontal surface underneath the friction surface (e.g., the window sill, or floor) are equal to or greater than the dust-lead hazard levels identified in paragraph (b) of this section. (2) Any damaged or otherwise deteriorated lead-based paint on an impact surface that is caused by impact from a related building component (such as a door knob that knocks into a wall or a door that knocks against its door

reasonably probable sources of lead, including environmental sources such as soil or items such as painted toys, by stating that the plaintiff did not have any contact with such sources. In sum, a lay witness's testimony or affidavit may serve as circumstantial evidence that, if believed, rules out other reasonably probable sources of lead exposure. We hasten to add that, at the summary judgment stage, a trial court cannot weigh the credibility of a witness and determine that the witness is not credible, and accordingly grant summary judgment against a plaintiff in a lead-based paint case on that basis. See Frederick Rd. Ltd. P'ship v. Brown & Sturm, 360 Md. 76, 93, 756 A.2d 963, 972 (2000) ("Evidentiary matters, credibility issues, and material facts [that] are in dispute cannot properly be disposed of by summary judgment." (Citations omitted)). Rather, any issue as to a witness's credibility is to be decided by the trier of fact, which is a jury in most, if not all, lead-based paint cases. Indeed, the standard that we announce today is simply that, where a plaintiff proceeds under a Dow theory of causation, a plaintiff need only produce circumstantial evidence that, if believed, would rule out other reasonably probable sources of lead exposure.

---

frame). (3) Any chewable lead-based painted surface on which there is evidence of teeth marks. (4) Any other deteriorated lead-based paint in any residential building or child-occupied facility or on the exterior of any residential building or child-occupied facility.

40 C.F.R. § 745.65(a) (paragraph breaks omitted).

We are mindful that Rowhouses argues that, to rule out a property as a reasonable probable source, evidence is required to demonstrate that a property did not contain lead-based paint hazards, and conversely, to rule in the subject property, evidence is required that the subject property contained lead-based paint hazards. At the summary judgment stage, where the standard is reasonable probability, the absence of expert testimony on this point is not dispositive as to whether a plaintiff produced sufficient circumstantial evidence to rule in the subject property as a reasonable probable source and to rule out other reasonably probable sources.

Before moving on, we pause to state that we are aware that, at the summary judgment stage, a witness's deposition testimony or affidavit may serve as circumstantial evidence that both helps to rule in the subject property as a reasonable probable source of lead exposure and to rule out other reasonably probable sources of lead exposure. For example, as in this case, a plaintiff's parent may testify at a deposition that the subject property contained deteriorated, chipping, and flaking paint, and that other properties in which the plaintiff resided or visited were in good condition and did not contain deteriorated, chipping, and flaking paint. For purposes of summary judgment, viewing the evidence in the light most favorable to the plaintiff—who is the non-moving party—and given that issues of credibility are the province of the trier of fact, the parent's deposition testimony could be sufficient circumstantial evidence that, if believed, would rule out the other properties as reasonable probable sources of lead exposure. We recognize that, in this scenario, the parent's testimony may be perceived as "self-serving," as Rowhouses contends. Nevertheless, whether the parent's testimony is credible is up to the trier of fact, and a defendant is certainly free at trial to probe the veracity of the parent's recollection of the conditions of the various relevant properties.

*The Properties in this Case*

With the principles established above in mind, we turn to the case at hand. Here, we are specifically concerned with the source of Smith's lead exposure and elevated blood-lead levels in 1992 and 1993, the narrow time frame during which she resided in the Oliver Street Property. The record reveals that all of the following are **possible** sources of Smith's lead exposure during that time period: (1) the Monroe Street Property, where Smith lived

from birth until either late 1991 or Spring 1992; (2) the Oliver Street Property, where Smith lived from either late 1991 or Spring 1992 to Spring 1993; (3) the Ashland Avenue Property, where Smith visited once per week or every other week for two to three hours each visit while she was residing at the Monroe Street Property and the Oliver Street Property; and (4) environmental or other sources, such as soil or toys. Upon review of the record, we hold that Smith produced sufficient admissible circumstantial evidence from which a trier of fact could conclude that the Oliver Street Property contained lead-based paint and was a reasonably probable source of Smith's lead exposure, and that there were no other reasonably probable sources of lead exposure—*i.e.*, the circumstantial evidence ruled out other reasonably probable sources of lead exposure.

We start by examining the circumstantial evidence that ruled out the other sources of lead as reasonably probable sources.[15] As to the Monroe Street Property, Smith produced the following circumstantial evidence: (1) Plater testified at her deposition and/or averred in her affidavit that Smith resided at the Monroe Street Property from her birth on October 21, 1991, until either late 1991 or Spring 1992; (2) Plater testified at her deposition that Smith did not crawl or walk while residing at the Monroe Street Property—*i.e.*, she

---

[15]We recognize that, where a plaintiff proceeds under a <u>Dow</u> theory of causation, the plaintiff needs to rule out only other reasonably probable sources of lead, and is not required to rule out all possible sources of lead (*i.e.*, sources of lead that do not rise to the level of reasonably probable sources). <u>See, e.g.</u>, <u>Hamilton</u>, 439 Md. at 538, 96 A.3d at 736 ("Where a plaintiff who does not produce evidence to support another theory of causation and, instead, relies on a causation theory [that is] similar to that espoused in *Dow*, the validity of the necessary inference is limited to those circumstances where the plaintiff is able also to exclude other reasonably probable sources of lead exposure."). For purposes of our analysis in this case, we assume, without deciding, that all of the possible sources of Smith's lead exposure rose to the level of reasonably probable sources.

was not mobile—and Plater did not observe Smith come into contact with any possible lead-based paint hazard; (3) Plater testified at her deposition that the Monroe Street Property was in "[g]ood condition[,]" meaning that it did not contain deteriorated, chipping, or flaking paint; and (4) Smith's first blood-lead test occurred on September 25, 1992—*i.e.*, at least three months after Smith moved from the Monroe Street Property to the Oliver Street Property—and the test indicated an elevated blood-lead level.

As to the Ashland Avenue Property, Smith produced the following circumstantial evidence: (1) Smith never resided at the Ashland Avenue Property; (2) Plater testified at her deposition that, while residing at the Oliver Street Property, Smith visited the Ashland Avenue Property every other week for two to three hours each visit; and (3) Plater testified at her deposition that she never observed any chipping, flaking, or peeling paint at the Ashland Avenue Property. Additionally, on brief, Smith pointed out that Plater never testified at her deposition that the Ashland Avenue Property had dust on the floors, as she did as to the Oliver Street Property. Essentially, Smith established that she spent a very small amount of time, less than six hours per month, at the Ashland Avenue Property, and that, according to Plater, there was no evidence of chipping and peeling paint at the Ashland Avenue Property—*i.e.*, there were no known lead-based paint hazards at the Ashland Avenue Property.

And, as to environmental or other sources, Smith produced the following circumstantial evidence: (1) Plater testified at her deposition that she never took Smith to any playgrounds or parks; and (2) in her affidavit, Plater averred that, to her knowledge, while residing at the Oliver Street Property, Smith "had no contact with old battery casings,

lead figures, painted toys, plastic jewelry, naval paint, bullets, fishing weights, ceramic pottery, folk medicine[,] or any other source of lead[.]" Viewing this evidence in the light most favorable to Smith—and, again, keeping in mind that credibility determinations are properly left to the trier of fact—we conclude that Smith produced sufficient admissible circumstantial evidence that, if believed, rules out the Monroe Street Property, the Ashland Avenue Property, and environmental and other sources as reasonably probable sources of her lead exposure.

At oral argument, Rowhouses's counsel made much of the circumstance that Dr. Simon testified at his deposition that, as to the Ashland Avenue Property, he "couldn't rule it in, and [he] couldn't rule it out at th[at] point." Rowhouses's reliance on this point is a red herring. As stated above, see supra Footnote 8, both the circuit court and the Court of Special Appeals determined that Dr. Simon lacked an adequate factual basis to support his opinion that the Oliver Street Property contained lead-based paint and was a substantial contributing source of Smith's lead exposure, and that his opinion was not admissible to prove causation; and, in this Court, neither party has filed a petition or cross-petition for a writ of *certiorari* as to the issue, and, accordingly, we do not address the matter. As such, the circumstance that Dr. Simon could not rule the Ashland Avenue Property in or out is of no consequence whatsoever to our analysis in this case. Moreover, as discussed above, evidence in the form of expert witness testimony, although potentially helpful, is not required to rule in or out a reasonable probable source. Indeed, as we explain, Smith produced sufficient circumstantial evidence, even without Dr. Simon's expert testimony, from which a trier of fact could conclude that the Oliver Street Property contained lead-

based paint and was the only reasonable probable source of Smith's lead exposure. And, in any event, as Judge Battaglia pointed out at oral argument, Dr. Simon's deposition testimony that he "couldn't rule [the Ashland Avenue Property] in, and [he] couldn't rule it out at th[at] point" is a matter of equipoise, or a state of equilibrium or counterbalance. Simply put, Dr. Simon's testimony as to the Ashland Avenue Property added nothing to the circumstantial evidence analysis. With certainty, under our holding today and as an extension of Hamilton, Smith did not need expert testimony to provide evidence sufficient to rule out the Ashland Avenue Property as a reasonable probable source. That Dr. Simon could not render an opinion one way or the other does not bar Smith from meeting the standard for ruling out the Ashland Avenue Property through the use of other circumstantial evidence at the summary judgment stage.

That Smith produced sufficient admissible circumstantial evidence to rule out other reasonably probable sources of lead exposure is not the end of our analysis. We must also determine whether Smith produced sufficient admissible circumstantial evidence that rules in the Oliver Street Property as a reasonable probable source of her lead exposure. As the Court of Special Appeals did, see Smith, 223 Md. App. at 668-69, 117 A.3d at 628, we conclude that Smith produced sufficient circumstantial evidence to demonstrate that the Oliver Street Property contained lead-based paint and was the only reasonable probable source of Smith's lead exposure for the relevant time frame. As to the Oliver Street Property, Smith produced the following circumstantial evidence: (1) Plater testified at her deposition and/or averred in an affidavit that, from not long after Smith's birth, sometime in late 1991 or Spring 1992, until Spring 1993, Smith resided at the Oliver Street Property;

(2) in an affidavit, Plater averred that Smith "spent almost all of her time at" the Oliver Street Property while they resided there; (3) at her deposition, Plater testified that, approximately three to four months after moving into the Oliver Street Property, Plater noticed that the paint on the "[w]indowsills, the banister[, and the] baseboards" "started chipping and peeling"; (4) Plater noticed dust on the floor in the Oliver Street Property while they resided there; (5) while residing at the Oliver Street Property, Smith began to walk; (6) at her deposition, Plater testified that Smith spent time in areas in the house near deteriorated paint and that she observed Smith put her hands in her mouth while living in the Oliver Street Property; (7) Smith had her first blood-lead level test while residing at the Oliver Street Property, and the test indicated an elevated blood-lead level; and (8) the Oliver Street Property was most likely built in the early 1900s or earlier. Although there was no direct evidence of lead-based paint at the Oliver Street Property, Smith produced evidence that, between approximately 1991 and Spring 1993, she spent substantially all of her time in one house, the Oliver Street Property, a property that had chipping and peeling paint and where she experienced elevated blood-lead levels. This evidence is sufficient to establish a reasonable probability that the Oliver Street Property contained lead-based paint and was the source of Smith's lead exposure. Viewing this evidence in the light most favorable to Smith, and remembering that credibility determinations are properly left to the trier of fact, we hold that Smith produced sufficient admissible circumstantial evidence that, if believed, demonstrated that the Oliver Street Property contained lead-based paint while she resided there, and, given the circumstantial evidence that rules out other reasonably probable sources of lead, that the Oliver Street Property was the only reasonable

probable source of Smith's lead exposure. Stated otherwise, Smith presented through circumstantial evidence a *prima facie* negligence case. Accordingly, the circuit court erred in granting summary judgment in Rowhouses's favor as to Smith's negligence claim.

We observe that our above analysis is based on Smith's reliance on a Dow theory of causation, which requires that other reasonably probable sources of lead exposure be eliminated. As we discussed in Hamilton, 439 Md. at 537-38, 96 A.3d at 736, however, this is not the only way in which a plaintiff can present a *prima facie* negligence case. Here, in response to Hamilton, Smith filed a supplement to the opposition to the motion for summary judgment in which she produced additional circumstantial evidence from which a trier of fact could infer that the Oliver Street Property contained lead-based paint and was a reasonable probable source of Smith's lead exposure. Specifically, Smith produced the following additional circumstantial evidence: (1) properties near the Oliver Street Property were built in either 1914 or 1915; (2) records from the Baltimore City Health Department Lead Paint Poisoning Prevention Program showed that properties on East Oliver Street had been issued numerous lead-based paint violation notices over the years; (3) on August 11, 1987, 1620 East Oliver Street, the row house immediately next door to the Oliver Street Property, had been issued a violation notice by the Baltimore City Health Department for the presence of lead-based paint on twenty-six interior surfaces and five exterior surfaces; (4) on January 6, 1988, 1620 East Oliver Street had been issued another violation notice by the Baltimore City Health Department for the presence of lead-based paint on ten interior surfaces; and (5) a lead-based paint survey report for 2324 East Oliver Street noted the presence of lead-based paint on twelve interior surfaces. This

circumstantial evidence bolsters the reasonable inference that the Oliver Street Property contained lead-based paint and was a reasonable probable source of Smith's lead exposure.

In conclusion, for the above reasons, we hold that the circuit court erred in granting summary judgment in Rowhouses's favor as to Smith's negligence claim because, even without direct evidence that the Oliver Street Property contained lead-based paint and without Dr. Simon's expert testimony as to the source of Smith's lead exposure, there was sufficient circumstantial evidence from which a trier of fact could conclude that the Oliver Street Property contained lead-based paint; *i.e.*, a jury could conclude that the Oliver Street Property was a reasonable probable source of Smith's lead exposure and that there were no other reasonably probable sources of lead exposure. We observe that our holding is simply that there was sufficient admissible circumstantial evidence to preclude summary judgment. Ultimately, though, it will be up to the jury to determine liability at trial, and, if the jury finds Rowhouses liable, any damages.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**